Good morning, may it please the court. Howard Goodfriend representing the appellants John Atchley and Michael Gilroy, former Pepperidge Farm distributors who were granted exclusive territories in eastern Washington and northern Idaho. They were plaintiffs below in this diversity case. I'd like to reserve hopefully five minutes for my rebuttal. We'll see how that goes. The district court dismissed the plaintiffs statutory and common law claims arising from their purchase and operation of these distributorships. I'd like to focus my remarks today on the issue of whether this was a franchise and whether Pepperidge Farm violated Washington's Franchise Investment Protection Act. Just to set the context, if you prevail on the franchise, what is it, what's the remedy you're seeking? Well, we're seeking, the remedies under 19.100.1902 are broad, and they basically provide that you can sue at law or equity for damages for rescission or other relief as the court deems appropriate. With respect to Mr. Atchley, we're asking a remand for a determination of whether he's entitled to three times his losses incurred as he went on, and because of the differential on sales price. With respect to Mr. Gilroy, I think we're seeking the same relief. We're seeking the difference between what he paid and what he got plus all his losses that were incurred while he was operating the franchise, plus, of course, attorney's fees and costs, which would negate the deficiency judgment that Pepperidge Farm obtained after it sold his franchise at public sale for less than half of what he paid for it. I wasn't trying to signal anything. I just wanted to try to figure out what the effect of the franchise. Yeah, and that's a good question because generally it's rescission, but where the consideration didn't go directly to Pepperidge Farm, it basically served as a guarantor in respect to Mr. Atchley. I think he purchased this as a company route. He did not even know of the existence of the prior distributor, so it was initially brought, I think, as a rescission suit because he thought he was buying it from Pepperidge Farm. The district court relied on the absence of a franchise fee in its summary judgment. Pepperidge Farm, of course, disputes the other elements, but I'd like to focus on that. A franchise is basically the right to distribute the franchisor's products under the franchisor's trade name in exchange for a fee. The fee that we were alleging here, which the district court basically found was simply a transfer of risk of loss, were the fees that were incurred as a result of Pepperidge Farm's stale policy, which was not announced to these plaintiffs until after they had closed and began operating several months into the operation of their franchises. The stale policy provided that any products which expired past their good date had to be basically at wholesale prices by the distributors in excess of 1% of their quarter. So I think the district court's reasoning might have some validity to the extent that the distributors could control the amount of products that were placed in stores and then make judgment calls about whether they were going to go bad, whether they were going to sell enough or take them back. But here, even there, I think there were problems with that reasoning. But what the district court ignored, I think, was the effect of this pallet delivery system whereby the distributors had no control whatsoever over a substantial portion of their deliveries, which were made directly by Pepperidge Farm on pallets to central to the warehouses of large chain stores, Safeway's, Albertsons. Let me go back to Judge Fisher's first question. The actual impact of this fee was on a relatively, on your theory, on some proportion, I don't know what proportion, of the product, but not all of it. In other words, it wasn't the usual sort of, everything was a mandatory purchase, maybe a small portion of it was. I don't know what the proportion is. Do we know what the proportion is? We don't know in proportion terms, but we know that it was at least $1,000 per quarter for Mr. Golden. So it's not much. Well, in the grand scheme of things, it cuts down on the margin. And I think on reconsideration, there is evidence of it. What I'm wondering is, how does that tie back into, is this, is the remedy therefore, or is this really about only a small part of the products at hand, and, or is it a kind of a trigger, such that if there is any fee, the whole operation becomes, comes under the statute? That's exactly correct, Your Honor, because if you pay a franchise fee, and if a franchise exists, you have to comply with the requirements of the act. And if you don't, then all bets are off. And as a practical matter, the imposition of this policy affected the value of these franchises, far in excess of the particular, you know, numbers of cookies or crackers that had to be returned. But the policies behind franchise protection laws are to protect franchisees who have inferior bargaining power once they've made a substantial investment, to prevent franchisers from behaving inequitably once they've sunk some money into a franchise. Mr. Goodron, I'm sorry, but I really have to back up, because in order for there to be a franchise fee, doesn't a franchise, franchise have to be sold or transferred from the franchisor? No, it does not. In fact, there's a provision that basically, it's a safe harbor for the transfer of a franchisee's business from one franchisee to another. That is exempt. But if the franchisor is involved and participates to any degree in that sale or transfer, then it is not exempt. And I think that's what we have here. We have Pepperidge Farm advertising, negotiating, approving, and basically setting the terms of these transfers. And as I mentioned earlier, Judge Tashima, with respect to, I think, Mr. Ashley's purchase, there was never a disclosure until he went and signed his signing documents that he was buying it from anyone but Pepperidge Farm himself. They were prohibited from talking to the prior distributors or other in that respect, because this was basically Pepperidge Farm securing another franchisee when the existing franchisees could not make it. And that's what happened here. Pepperidge Farm maintains also that there wasn't a marketing plan within the meaning of the statute. What is the marketing plan here? Well, that's correct. And that wasn't addressed by the district court, but I think we addressed it on our reply brief. The element is the right to under a marketing plan. And here, I think, if you really don't have to go beyond the agreement itself, paragraph four of the consignment agreements state that Pepperidge Farm prescribes the sales territories, it approves sales personnel, it requires their training and cooperation in all of its marketing programs. I think on reconsideration, I think it's 160 is the truck's record number, there was substantial photos of the displays that these gentlemen had to maintain. And it's also clear that Pepperidge Farm expressly controlled the use of its mark. It was authorized to revoke the agreement if it was dissatisfied in any way with the manner in which its mark was used, the appearance of their trucks, the personal appearance of their wardrobe. So there was substantial control by Pepperidge Farm here over the products were sold under these consignment agreements. So could you be more specific about exactly what you're calling the fee? Is what you're saying is that there was a mandatory purchase requirement for stale goods and that that meets the mandatory purchase requirement example with regard to fees? That's basically correct, Judge Briggs. But it's contingent, and it has to be, on the fact that they didn't get to choose how much, because they weren't paying for the initial goods. That's correct. And so if they had control over the amount of goods, then it doesn't appear that saying that anything that goes stale is your problem would be a fee. Well, I think that's what the district court reasoned. But what the district court ignored was the fact that these pallet deliveries were made directly to the stores. So you're not relying on the other retail sales, only the pallet? Well, I think to a certain extent we are, because they were pressured directly to maintain a fresh stock of, you know, to make it look like there's a lot of product here, to stock stores fully. I think that's in both the declarations on summary judgment. And hidden franchise fees are certainly franchise fees nonetheless. And we've cited that Seventh Circuit case that I think is probably the closest, which is Wrightmoor v. Rico, which talks about excess inventory. If you have to buy it, and it's illiquid, it can't be returned, then an excess inventory requirement by a franchisor is, in fact, can be a hidden fee. And I think that's what we had here. And the district court erred in not giving these plaintiffs the opportunity to develop that further and dismissing it on summary judgment. It's Wrightmoor, W-R-I-G-H-T. And I'll get you the site on rebuttal if I... Well, it's in your brief, page 21, right? There you go. I'll reserve the rest of my time. Thank you. All right. Thank you. May it please the Court, I'm Forrest Hainline. I'm with Robert Bader. We represent Pepperidge Farm. I'd like to start by addressing the pallet deliveries and stale issue. And I want to call your attention to two agreement that deals with overcode products. It's at the supplemental court record at 183 for Mr. Atchley and 206 for Mr. Gilroy. And then the pallet delivery letter, which is supplemental record 188 for Mr. Atchley and 209 for Mr. Gilroy. First, we begin with this statement. Hold on a second. I want to make sure I get that. Yes, Your Honor. The delivery letter is what? 183 for Mr. Atchley. No, the pallet delivery letter. Oh, the pallet delivery letter. I'm sorry, Your Honor. That is 189 for Mr. Atchley and for Mr. Gilroy it is 210. The overcode letter provides that I understand that damaged and overcode items are not returnable to you for credit unless you make exceptions in a particular case by giving me written notice. So you start with the idea that the distributors will order a product and if they don't care for the product by properly rotating it on the shelves or keeping it in their own warehouse for an excessive length of time that they cannot return this product to Pepperidge Farm for credit at all. Now Pepperidge Farm from time to time did make exceptions to this and in this particular case said we will accept returns up to 1 percent of your sales. Well, that's certainly not a fee. It's a credit. How does this work? I understand all of that. But the suggestion is that with regard at least to the pallet sales that they didn't have control. You began with the premise if they order correctly and care for the product and his contention is that they did not have that control over the pallet sales products. And here's how that works. You begin with paragraph 9 of the consignment agreement which provides that if product is delivered to the central warehouse of a customer. This That's the first reference for Mr. Atchley and for Mr. Gilroy. I assume they're the same. It's the same. Okay. That under paragraph 9 if product is delivered to the central warehouse of a store then Pepperidge Farm and that Pepperidge Farm is doing all the work in this case. It's delivering the product on in turn delivers that product to its own individual stores. Under that circumstance Pepperidge Farm can make that delivery for its own account and doesn't pay the distributor any commission at all. It's allowed to do that. Under the pallet delivery letter, Your Honor, the distributor acknowledges that this is the situation and then agrees that it will accept a 20% commission on all these deliveries if it agrees to two things. One, it will pay Pepperidge Farm, reimburse Pepperidge Farm for a portion of Pepperidge Farm's additional costs involved in palletizing and it will care for the product. So what does this mean? The only evidence in this record. Could you show me where the care for the product line is? Yes. I agree. This is the middle paragraph, Your Honor. Of what? Of the pallet delivery letter. Sorry, Judge Fischer. I agree that once such consigned products are so delivered to any retail store in my territory, I will when requested provide service to those stores. That means care for the product? Yes. All right. So how does that help you? I don't know. How does that help me? What we have is a situation where the distributors are not being assessed a fee but are being paid money that they would not or otherwise be entitled to. The only evidence in this record that even arguably ties the pallet delivery program to the stale issue is excerpt of Record 123 at Exhibit C. This document on its face does not in any way tell us that these particular sales were in connection with pallets, but let's imagine that they were. Are you saying that in fact the stale fees were not being charged with regard to the products that were sold through pallets? I'm really confused about what your argument is. Because this isn't a contract-based issue is the fact that they the arrangement between Pepperidge Farm and the distributors with regard to the pallets and whether it was initially not within their purview and now is within their purview is really I don't see the pertinence of that to the franchise statute problem. Because the franchise statute requires payment of a fee. Okay. And in fact in the end however we got there through the contractual process. There is no fee and here is why. Under this document $74,000 of product was delivered. Under the contract and under the pallet delivery letter Mr. Gilroy would receive a 20 percent commission or approximately $15,000 for basically doing virtually nothing. He was charged $975 for the return of stale product. He was not charged a fee. He was not required to buy product. He was paid for product he did not deliver, product that he didn't have to spend any work dealing with. He was paid a fee of almost $15,000 less. I understand it's sort of a tail wagging the dog argument but in order to get that money he had to buy $1,000 worth of product, i.e. stale product. He did not have to buy anything. He had to pay for it. He didn't have to pay anything. He had to take over code product off the shelf and that was a deduction from his commission. Yes, which commission on the pallet sales? Yes. Was there tracing of this? No. I'm making this argument based on an assumption that was in the reply brief that this page which is the only evidence in the record tying these two ideas together. I'm sorry, this page what again? It's ER 123 Exhibit C. I'm accepting for purposes of my argument that there is some evidence associating pallet fees with the stale and there isn't any. Okay, so can I just see if I understand what you're saying. You're saying that they went into this knowing that there would be these direct pallet sales. At some point Pepperidge Farm gave them the opportunity then to earn a commission on it because they would then go in and maintain the shelves and what the appearance and all of that. They didn't load them up, deliver them, but they did have to go to those regional stores that were fed by the main Safeways or whatever warehouse. The stores in their territory, they went and treated them as if they were direct customers. Is that right? Yes. They visited them and so they worried about the appearance, so at least they had to take care of them to that extent. And for that they got a 20% commission on the sales that were made basically directly by Pepperidge to Safeway, using that as an example. Is that correct so far? Yes. All right. And then what you're saying is, yes, that may have created an overstock or each of these distributors' area, it may have contributed to it, and that percentage of inventory, they didn't control the amounts, but the worst that happened to them is that their generous commission they got was offset by some amount that could be traceable to overcode in those particular stores. Or it may have been, because it's a percentage of sales, isn't it? It's a 1% limit on a percentage of sales, yes, sir. Sales of the distributor? Yes. Okay. So basically... It's sales of the distributors across... Across all of the stores? Across everything that they're getting commission on. If they didn't sell technically to Safeway? Correct. All right. So you're saying then there's no fee other than it's an offset, basically, for the overcode that is in the system that they're operating, some of which inventory, overcode inventory, was supplied by Pepperidge, but they got a 20% commission on it. That's correct. Now, and that's assuming that the argument they make in their reply brief is accurate. There is no evidence in this record whatsoever tying pallet deliveries to the stale. There's no evidence... So you're saying what you mean is that you can't prove from the record that any of the stale product for which they were charged was from pallet deliveries? That's correct. Yeah, there's no evidence of that. In an ordinary franchise situation, or if there is a franchise, an ordinary one... Oh, there is. But one could say were certainly meant to be covered by the statute. The fact that the distributor is making money, or is supposed to be making money, is not the issue. In other words, if, for example, they had to buy X amount of product, and were in fact paid 20% of anything they sold, and ended up with a net profit, that would not be a proof that there wasn't a fee, right? Well, not exactly. I mean, the key language is unrecoverable investment. And if you have, even in the situations in the various states under the they look at mandatory sales, those mandatory sales have to be, A, unreasonably large, or B, that they're at a price that is higher than a good wholesale price, so that the distributor ends up not making money. It's not a situation where somebody is being paid, you know, basically money for nothing, or almost nothing, and then saying, well, I didn't get quite as good in franchise fee. That's what's here. But your question about a typical franchise fee. You have an over-market price for, let's just assume, for a mandatory amount of product that you have to pay, so you are, but you're nonetheless making a profit that the increment of what you would have made if you weren't being overcharged is not a hidden thing. I don't see, I don't see cases like that. And there's nothing in the Washington cases remotely of finding that a credit, or a limit on the amount of product you can return after you get it that has been offered to you at a bona fide wholesale value is somehow a franchise fee. I'd like to turn, just for a minute, I have very little time, but on the other two issues on this franchise, because there are typical franchises, and you see them all the time, 7-Elevens, McDonald's, Dunkin' Donuts. A key to these is you can't tell, as a consumer, whether it's a franchise store or if it's a company store. Pepperidge Farm wrote this agreement to have exactly the opposite effect. The trademark use is limited. It's only allowed on the truck and uniforms if you don't have a sloppy truck. It's not, by the way, saying that you can't use my trademark if your truck doesn't look good is not a marketing plan, as counsel would have it. And paragraph 12, in our brief, we refer to the trademark issue to paragraph 4. That's a mistake. In paragraph 12 of the agreement, it specifically requires the distributor to do nothing that would make any confusion between the distributors' business and Pepperidge Farm's business. They are intended to be separate, and there's no marketing plan. Paragraph 4. How would the consumer in Safeway know that there was any difference between the trucks that delivered the pallets to the warehouse and the trucks that delivered the pallets to the stores? Well, the consumer at Safeway doesn't see the trucks that deliver pallets. They may see those. They go to the warehouse at Safeway. A consumer may see. So what's the distinction you're drawing? I mean, I understand what a McDonald's, a company-owned McDonald's is, and a franchise McDonald's. You don't know whether it's a franchise or not, but doing it in a distribution system on the basis of trademark, the trademark shows up in the store. So as far as the consumer is concerned, it got there through Pepperidge Farms. The language of the statute? And if it sees a truck outside delivering the pallet or whatever, the rack of Pepperidge Farm breads, they're probably going to assume it came from Pepperidge Farms. Don't you think? No. The language of the statute, where you should begin and end, is that the operation of the business is substantially associated with the trademark. I must say that your other argument was very interesting and provocative, but this one just seems silly. I mean, obviously it's substantially associated with the trademark. The trademark's on the truck, and they're running around the truck, and they're handing out these products with the trademark. So how is it not substantially associated with the trademark? Because paragraph 12 also allows them to distribute other products on that same truck. But they can do it with the Pepperidge Farms logo. So as far as the consumer sees it, it's a Pepperidge Farms truck, right? I don't. Well, I think so. There's no evidence the consumer ever sees the truck at all. Well, you brought it up. No, but I did, because there is a difference between... Well, but the consumer in this case is the retail store. And the retail store sees the truck all the time, right? No, that's a very good point, Judge Akima. You're over. No, you can answer that. Okay, I'll answer that. Except for the pallet delivery stores. No, because the chain stores, under paragraph 3B, are centrally billed by Pepperidge Farms. The stores know that this distributor only delivers product. I'm sorry. When I walk up to whatever store and there's an Arrowhead Springwater truck out in front of it, I don't know if that's Arrowhead Company's truck or a distributor's truck. That's what I see. And when I go in, there's Arrowhead Springwater on the shelves. I don't see any difference between that and Pepperidge Farms, which is also on the shelves of the same store. But that's... Yes. I think I answered why the store views it can be a truck. The store may be, but not the retail consumer. Okay, in any event, there we go. To address a few of the premises about a fee, you don't start with the idea that the distributors will order the product, as Pepperidge Farms asserted here, because under this pallet delivery program, you start with the assumption that the distributor has no control over the product. And when these gentlemen entered into their agreements... But they're not paying for it either. They're paying for it when it's delivered. They are paying for it. How are they paying for it? Well, they're paying for it, they're charged $30 per pallet, and then when they entered into the agreement, they could go, because they have to service the stores, they were required to pick up any stale product, and at that point, they could sell it and make some money on it by going to a Pepperidge Farm outlet store and selling it there. That terminated several months into the distributorship, at which point, the pallets are delivered, they're charged $30, anything that's not sold, they have to eat. You're not claiming the $30 as a franchise fee? The $30, no, the $30, there was an evidence for feuding Pepperidge Farms, evidence that it was associated with the cost of the delivery and the shrink wrapping and things like that. What's your response to Mr. Hanline's argument that, well, there's no fee involved because it's all just a small offset from the commission? Well, the deal when these guys entered into their distributorships was they were shown, these are the, this is how much you will make on this route, historically, and those revenues were basically what drove the purchase price and how much they invested. That doesn't answer my question. I'm sorry. What's your response to his argument that there's no fee involved because it's just an offset to the commission? Well, what happens is they are paying, when they enter into this agreement, they had the right, there was no franchise fee because they were making this money. That's not exactly the issue. We're still trying to figure out what is the franchise fee under the current, or under the final circumstances. Forget what happened earlier, it doesn't matter. Right. It's shifted to we can make money on stale product to we now have to eat all the stale product. But you don't. Well, the thing is, as I understand it, I think we're all trying to get you to answer this part of the structure. They get a 20% commission on the delivered product to the warehouses. That's an income. That's revenue. That helps them. So if his hypothetical is he gets, in a quarter, he gets $15,000 and he has to pay an offset of 975 for overstock. Why is that a franchise fee? Why does it change the structure of the deal going in? Because it didn't change the structure of the deal going in. It was imposed into the franchise. But what was the harm? It sounded like it was a better deal. It isn't, though, because prior to that, they could take the product and then sell it. They weren't getting the 20% commission? No, they were getting the 20%. But that is a contract problem. That's what I'm trying to get you off the question of this fact that this changed because it doesn't matter, as I understand it, to the franchise fee question. The question is, was the status quo at the point that you're complaining about a fee? Whatever may have been true earlier. And then you have to answer Judge Fisher's question. The fact that earlier they didn't think this was going to happen doesn't change the fact that, in the end, they're still net, as I understand it, getting a quite substantial percentage commission on product that they are not delivering. I'm going to answer this as best I can. When you shift the inventory to something that the distributor controls and can make money on to something that they don't control anymore and they cannot make money on, you are basically imposing a fee on the distributor. It's money that's going from the distributor to the franchisor for the privilege of doing business and operating that franchise. And that's the fee in this case. Well, it's for the privilege of getting this commission, which I gather they didn't need to get. Well, if they didn't need to get it, then they... I mean, couldn't they have refused to get the commission on the pallets? No, they could not. I think they were... Well, if they didn't get the commission on the pallets, they still would have the obligation of servicing the stores, and I think that's what happened here. They said, we can't deal with these stores. We're going to stop servicing the stores, and that's how this dispute arose, because they said, we don't want to do this anymore. And Pepperidge Farms said, no, you can't. You're violating the terms of your contract. One last question. What about my hypothetical? If you had a... Because I'm trying to understand the whole concept of mandatory sales as a fee. If you had a mandatory sale at an above market rate, but the franchisors still were able to make money on the sales, is that a fee or isn't it a fee? It would be a fee if it was in excess of... Yeah, it would be a fee, but you don't see those cases because nobody's going to sue if they're making money. You only see the cases where they're suing because they're losing money, but it still would be a fee if it's not tied to a bonafide wholesale price and the distributor doesn't have control over the amount that's sold. I want to... Judge Tsushima, did you get your question? No, I'm fine now. Okay. All right. Thank you. Thank you very much. Thank you for the argument, and the case is submitted.
judges: Tashima, Fisher, Berzon